575 P.2d 1265

STATE of Arizona, Appellee,

v.

Abelardo P. DURAN, Appellant.

No. 1 CA–CR 2256.

Court of Appeals of Arizona, Division 1, Department A.

Jan. 10, 1978.

Rehearing Denied Feb. 3, 1978.

Review Denied Feb. 28, 1978.

Bruce E. Babbitt, Arizona Atty. Gen. by William J. Schafer, III, Chief Counsel, Criminal Division and Philip J. MacDonnell, Asst. Attys. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender by Paul J. Prato, Deputy Public Defender, Phoenix, for appellant.

## OPINION

NELSON, Presiding Judge.

The appellant, Abelardo P. Duran, was tried by a jury and convicted of 38 counts of altering public records, a felony, 37 counts of embezzling public funds, a felony, and one count of filing a false Arizona income tax return, a felony. Appellant was sentenced to a term of not less than 4 nor more than 5 years in the Arizona State Prison on each of the 38 counts of altering public records, the sentence for each count to run concurrently with the sentences on the remaining counts. Additionally he was sentenced to a term of not less than 9 nor more than 10 years on each of the 37 counts of embezzling, the sentence on each count to run concurrently with the sentences on the remaining embezzlement counts but consecutive to the sentences for altering public records. Appellant was further sentenced to a term of not less than 4 nor more than 5 years in the Arizona State Prison for the crime of filing a false Arizona income tax return, this sentence to run concurrently with the sentences imposed on the counts of altering public records.

During the years 1974 and 1975, appellant was employed by the State of Arizona as an Administrative Services Officer with the office of the Registrar of Contractors. As an Administrative Services Officer, appellant was responsible for the supervision of the collecting, depositing and accounting for various funds collected by the state agency.

Prior to appellant's accepting his position at the office of the Registrar of Contractors, the collecting and depositing of funds received by that office was done by various individuals, each of whom provided a check on the others to assure that all funds collected were properly accounted for and deposited with the office of the State Treasurer. However, soon after appellant took over as Administrative Services Officer, he consolidated the depositing and accounting functions in himself, despite recommendations to the contrary from the Auditor General's office. Consequently, instead of having separate individuals perform the various tasks of preparing deposit slips, depositing the funds, posting the deposits and balancing the books, appellant performed all these functions himself.

The funds received by the Registrar of Contractors were in the form of both checks and cash and were deposited with the State Treasurer's office two or three times weekly as large sums would accumulate. Both the cash and the checks would come to Mr. Duran, accompanied by a summary statement of receipts prepared by the licensing division. The statement of receipts was a standard form used by the Registrar of Contractors in preparing the first stage of a deposit to the State Treasurer's office, and had been in use for at least 16 years. Appellant would then complete a pay-in voucher (PIV), similar to a bank deposit slip, which would itemize the total cash and the total checks in each deposit, with a grand total encompassing both cash and check totals. The PIV was made up of an original and several copies for various accounting and cross-checking purposes. Appellant would then hand carry the deposits to the State Treasurer's office, where the cash would be verified and a validation number stamped on each PIV. The Treasurer's office would then deposit the funds with a bank depositary and would send a copy of the validated PIV to the State Department

of Finance, which would provide the Registrar of Contractors with computer printouts of all funds received by them. These printouts would be sent back to the office of the Registrar of Contractors at regular periods for balancing and as a means of reporting to that agency all funds deposited to its account. Following the consolidation of accounting and bookkeeping functions in appellant, he was then responsible for verifying and balancing these periodic computer printouts.

Appellant's defalcations began when he failed to deliver to the State Treasurer seven separate PIVs. Appellant immediately appropriated to himself the cash from these PIVs, but held back the checks, which he later substituted for cash on different PIVs. When he would substitute these checks, appellant would alter the statements of receipts to reflect an increase in the amount of checks deposited but would decrease cash accordingly. Although the grand total remained the same on the altered statements of receipts, the total of the checks would be increased to reflect the deposit of the checks previously held back by appellant, who would then pocket in cash a sum equal to the amount of the checks.

The destruction or secreting of the seven original PIVs and the altering of 31 subsequent Statements of Receipts formed the basis for the 38 convictions under A.R.S. § 38–421, altering public records. The 37 embezzlement convictions resulted from 37 separate thefts of the cash, 7 times from the destroyed PIVs, and 30 times as a result of the altered statements of receipts. The conviction for filing a false Arizona income tax return arose during the tax year 1975 when appellant failed to include in his tax

return approximately $20,000 in funds obtained through the foregoing scheme. Following sentencing, appellant timely brought this appeal, claiming that the trial court committed numerous errors.

## AUTHORITY OF ATTORNEY GENERAL TO PROSECUTE

Appellant first claims that the Attorney General of Arizona did not have lawful authority to prosecute appellant. The State, on the other hand, submits that the authority of the Attorney General to prosecute appellant was found in a written agreement [1] authorizing the Attorney General to submit appellant's case to the grand jury, and in the event of an indictment, to prosecute appellant.

The powers of the Attorney General with respect to the prosecution of criminal matters are set forth in A.R.S. § 41–193, which provides in part as follows:

"A. The department of law shall be composed of the attorney general and the subdivisions of the department created as provided in this article. Unless otherwise provided by law the department shall:

\* \* \* \* \* \*

5. At the direction of the governor, or when deemed necessary, assist the county attorney of any county in the discharge of his duties."

\* \* \* \* \* \*

Appellant argues that because the agreement between the County Attorney and the Attorney General did not set forth the reasons for the request, the requirement of

1. The written agreement was signed by Moise E. Berger as County Attorney and Bruce E. Babbitt as Attorney General, and provided as follows:

"The County Attorney of Maricopa County requests the Attorney General of the State of Arizona to present to the Maricopa County Grand Jury the evidence gathered in the matter of Abelardo P. Duran, pursuant to A.R.S. § 21–407. The County Attorney also requests the Attorney General, should the Maricopa County Grand Jury choose to indict

Abelardo P. Duran, to prepare the case, present it at trial, and handle all other matters having to do with the case.

The Attorney General agrees to provide the County Attorney with periodic reports on the status of the case as the County Attorney may from time to time request.

The County Attorney and the Attorney General agree that each may designate, by written instrument or orally, subordinates within their respective offices to perform the terms of their agreement."

necessity set forth in A.R.S. § 41–193(A)(5) was not met.

The powers of the Attorney General are derived solely from the legislature. *Shute v. Frohmiller*, 53 Ariz. 483, 90 P.2d 998 (1939). The question then becomes whether the written agreement between the Attorney General and the Maricopa County Attorney satisfied the requirements of A.R.S. § 41–193(A)(5).

If we were to accept appellant's argument that there must be an objective showing of necessity before a county attorney in Arizona could call upon the assistance of the Arizona Attorney General, this Court would have to determine each time the question was presented not only what reasons there were for such a request but whether or not such a request was warranted. There may be many reasons why a county prosecutor would request assistance from the Attorney General's office, including a shortage of available personnel, budgetary limitations, or as was probably the case here, lack of sufficient expertise in a very highly specialized area of prosecution. Whatever the reasons, the legislature has permitted the Attorney General's office to assist the county prosecutors "when deemed necessary". Without a more specific mandate from the legislature, this Court will not unduly hinder the administration of justice in this state by requiring the County Attorney on a case by case basis to justify his calling upon the assistance of the Attorney General. Thus, we find appellant's objection to prosecution by the Attorney General to be without merit.

## CONSTITUTIONALITY OF A.R.S. § 38–421

Appellant next complains that A.R.S. § 38–421 is unconstitutionally vague. The statute in question provides as follows:

"A. An officer having custody of any record, map or book, or of any paper or proceeding of any court, filed or deposited in any public office, or placed in his hands for any purpose, who steals, wilfully destroys, mutilates, defaces, alters, falsifies, removes or secretes the whole or any part thereof, or who permits any other person so to do, shall be punished by imprisonment in the state prison for not less than one nor more than fourteen years.

B. A person not an officer who is guilty of the conduct specified in subsection A of this section shall be punished by imprisonment in the state prison for not to exceed five years or in the county jail for not to exceed one year, or by a fine not exceeding one hundred dollars, or by both such fine and imprisonment."[2]

Appellant complains that, under a literal reading of the statute, no writing, note, rough draft, etc. can be altered, destroyed or removed without subjecting the one who does so to prosecution under the statute. Appellant further claims that the vagueness of the statute renders it susceptible to arbitrary and discriminatory enforcement at the unlimited discretion of the prosecuting authorities as to which persons to prosecute for what types of conduct. Moreover, any person given a writing prepared by a member of his department for editing or correcting risks a violation of the statute for any alterations or corrections which might be made.

We agree that under the most expansive reading of A.R.S. § 38–421 a wide variety of conduct, some of which may be constitutionally protected, might be punishable. It is clear, however, that this state has a valid interest in proscribing the very conduct of which appellant was convicted, i. e., destroying or secreting PIVs in order to cover the theft of checks and cash listed thereon and altering other PIVs to reflect the cash-

2. Pursuant to a stipulation between the prosecution and the defense, appellant was sentenced under subsection B of A.R.S. § 38–421.

ing of the previous stolen checks. Appellant thus falls within what has been called the "hardcore" of the statute.

■ One whose conduct falls within the "hardcore" of a statute may not complain because of the possibility of imprecision in the application of the statute at its periphery. *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). The facts in *Broadrick v. Oklahoma, supra* were similar to the facts of this case. In *Broadrick*, the defendants were charged with a violation of Oklahoma's version of the Hatch Act forbidding certain state employees from directly or indirectly soliciting or receiving any assessments or contributions for any political organization. The Act further prohibited membership in any local committee of a political party or the holding of office in a partisan political club or participation in the affairs of any political party or political campaigns. The appellants in *Broadrick* contended that the statute was unconstitutionally vague and overbroad in that a literal application of the statute would extend to such allegedly protected political expression as the wearing of political buttons or the display of bumper stickers. However, in *Broadrick*, as in the instant case, appellants had not engaged in any of the peripheral conduct, but as state employees had directly solicited money among their coworkers for the benefit of their superior.

In noting the weakness of the English language to convey meaning with absolute certainty, the *Broadrick* court held that, since the appellants were within the hardcore of the statute, they could not be heard to challenge its application to certain protected acts lying on the periphery of the application of the statute. In so holding, the court quoted from their recent opinion in *United States Civil Service Commission v. National Association of Letter Carriers, AFL–CIO*, 413 U.S. 548, 578–579, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973) as follows:

" '[T]here are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest.' "

The court in *Broadrick* then went on to say:

"Moreover, even if the outermost boundaries of § 818 may be imprecise, any such uncertainty has little relevance here, where appellant's conduct falls squarely within the 'hard core' of the statute's proscriptions and appellants concede as much."

The *Broadrick* court further stated, at 413 U.S. 611, 612, 93 S.Ct. 2915, 37 L.Ed.2d 839, as follows:

"Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the court. (Citations omitted). A closely related principle is that constitutional rights are personal and may not be asserted vicariously. (Citations omitted). These principles rest on more than the fussiness of judges. They reflect the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws. (Citations omitted). Constitutional judgments, . . . are justified only out of the necessity of adjudicating rights in particular cases between the litigants brought before the Court . . . . "

In the case before this Court, appellant has not alleged that this state lacks an interest in assuring the integrity of its written records. Appellant has not characterized his conduct as requiring a special degree of protection. There is no question that

appellant has destroyed or secreted and altered the records of the Registrar of Contractors to suit his own end. We therefore hold that appellant is without standing to assert the arguably protected conduct of others under A.R.S. § 38–421 when his own conduct falls squarely within its terms. *See also Dombrowski v. Pfister, supra* ; *United States v. Petrillo*, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947); *State v. Galbraith*, 114 Ariz. 174, 559 P.2d 1089 (Ct.App.1976); *Stock v. State*, 526 P.2d 3 (Alaska 1974).

## SUFFICIENCY OF EVIDENCE

■ Appellant next complains that the trial court erred in denying his motion for judgment of acquittal on the seven counts which dealt with appellant's failure to file the seven PIVs with the State Treasurer's office. Appellant further claims that there was insufficient evidence to convict him on these counts and that the mere failure to file or deposit PIVs does not constitute a violation of A.R.S. § 38–421.

■ This Court must consider the evidence presented below in the light most favorable to sustaining the verdict. *State v. Trotter*, 110 Ariz. 61, 514 P.2d 1249 (1973). The evidence presented was that appellant was the sole person charged with the responsibility of depositing the PIVs with the State Treasurer; that on seven occasions the originals of the PIVs were neither deposited nor validated but that appellant returned with the unvalidated copies of the PIVs and represented that they had in fact been deposited, his reason being that they were not validated because the validating machine had broken down. The evidence further showed that checks that should have been deposited by appellant at an earlier time appeared in later PIVs and were substituted for cash. This evidence, though circumstantial in nature,

was more than sufficient to sustain the jury's verdict that appellant either destroyed or secreted the original of each of seven PIVs. *See State v. Childs*, 113 Ariz. 318, 553 P.2d 1192 (1976).

## DOUBLE PUNISHMENT

■ The next issue raised by appellant concerns Arizona's double punishment statute, A.R.S. § 13–1641.[3] In particular, appellant claims that his conviction on the seven counts of embezzlement, involving the cash from the seven missing PIVs, together with the 30 counts of embezzlement arising out of the substitution of the previously withheld checks from these seven PIVs for more cash later embezzled, constitutes double punishment in violation of the statute.

Arizona's most authoritative recent case on double punishment is *State v. Tinghitella*, 108 Ariz. 1, 491 P.2d 834 (1971). Tinghitella was convicted of both armed assault with intent to commit murder and obstructing a police officer. These convictions arose out of an attempted arrest for driving while under the influence of intoxicating liquor. Tinghitella had argued that he could not be convicted for both obstructing a police officer and armed assault with intent to commit murder when both charges arose out of the same incident. The court affirmed Tinghitella's conviction on both counts, and in so doing adopted the "identical elements" test that when all elements of one charge are removed, the facts of the case must leave sufficient elements to support a conviction on the other charge, regardless of the time span in which both acts are committed.

Appellant, however, argues that in its opinion in *Tinghitella* the Arizona Supreme Court did not overrule the previous law announced in *State v. Vallejos*, 89 Ariz. 76, 358 P.2d 178 (1960), which had used a

---

3. A.R.S. § 13–1641 provides as follows:

"An act or omission which is made punishable in different ways by different sections of the laws may be punished under either, but in no event under more than one. An acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other."

"transactional test" where if one criminal act is done for the purpose of completing a second criminal act, it will be considered one transaction permitting but one conviction. Appellant argues that the transactional test under *Vallejos*, not having been specifically overruled by *Tinghitella*, is still a viable test. We disagree.

The language used by the Supreme Court in *Tinghitella*, relied on by appellant, is as follows:

"In order to dispel any apparent ambiguity in the cases cited, we hold that the most practical method of determining the number of 'acts' which may be punishable under § 13–1641 and with which an accused may be charged is the 'identical elements' test . . . . Thus the time span in which the number of acts may have been committed is not material so long as there is proof that each act was composed of the necessary criminal elements." 108 Ariz. at 3, 491 P.2d at 836, 837.

We believe this very language has the effect of overruling, or perhaps more correctly, superseding *Vallejos, supra.*

However, whether or not *Tinghitella* did in fact overrule *Vallejos* is immaterial to the resolution of this issue. *Vallejos* simply held that where the possession of marijuana was incidental to the possession of marijuana for sale, there was but one transaction and hence could be but one punishment. In the instant case, we not only have separate transactions but the evidence necessary to sustain a conviction on the seven counts is totally different than the evidence on the remaining counts under consideration.

In the seven counts of embezzlement arising out of the missing PIVs, appellant was charged with embezzling the cash only. He was never charged with embezzlement of the checks, which he appropriated for his own use in the scheme, but never cashed or used himself. The crime of embezzlement was complete as to the missing cash at this time. In the separate subsequent transactions, appellant substituted the withheld checks for additional cash in 30 more PIVs, altering the statements of receipts to reflect decreased cash and increased check deposits. The evidence to support a conviction on one of these charges, that is, stealing cash belonging to the State with which he had been entrusted, is separate and distinct from the evidence necessary to sustain a conviction for the subsequent acts, namely, stealing additional cash by substituting the checks previously held out from the destroyed PIVs for the cash which should have accompanied the subsequent deposits.

■ Similarly, appellant claims that the charges of altering, secreting or destroying a public record under A.R.S. § 38–421, relative to the seven missing PIVS, together with the embezzling of the monies to have been deposited therein also constitutes double punishment in violation of A.R.S. § 13–1641. Perhaps appellant's argument would have some merit if the embezzlement of the funds was a necessary element of proof for a violation of A.R.S. § 38–421. It is clear that the purpose for appellant's altering the Registrar's records was to ultimately embezzle cash funds. The violation of A.R.S. § 38–421, however, was completed with the destroying or secreting of the PIVs and had nothing to do with the crime of embezzlement, even though the embezzlement was appellant's intended objective in destroying or secreting the PIVs. This case is not analogous to *Vallejos*, where one marijuana possession was simply wearing two statutory hats, i. e., possession characterized as mere possession and possession characterized as possession for sale with the additional element of an intent to sell. Here we have a destroying or secreting of public records and a subsequent embezzling of cash. An analogous situation is found in *State v. Arnold*, 115 Ariz. 421, 565 P.2d 1282 (1977), in which the Supreme Court reviewed dual convictions of burglary and petty theft. The Court held that although the object of the burglary was to commit the theft, the burglary charge was satisfied with the unlawful entry with the intent to commit the

theft and a conviction on both would not violate A.R.S. § 13–1641. Likewise, in appellant's case, the secreting or destruction of the PIVs may have been done with the intent to commit the embezzlement. However, the violation of A.R.S. § 38–421 was complete before the embezzling was commenced, even though some of the evidence submitted may have been applicable to both offenses. *State v. Arnold, supra.* This same rationale would hold true for appellant's next contention that a conviction for various counts of altering the statements of receipts and a subsequent embezzling of the cash by substitution of the previously stolen checks constitutes double punishment. Once again, the alteration was completed when appellant laid down his pencil or pen with the intent to achieve his own unlawful purposes. The subsequent or previous appropriation of the cash itself was a separate crime from that of altering the records to cover it up.

Concluding as we do that appellant's various convictions do not violate the proscriptions of A.R.S. § 13–1641 and were properly submitted to the jury, we need not reach appellant's final argument under this section that the submission to the jury of the counts relating to the alteration of public records and embezzlement denied appellant a fair trial by making it more likely that he would be found guilty on all charges. *See State v. Hunt,* 2 Ariz.App. 6, 406 P.2d 208 (1965).

## REFUSAL TO GIVE REQUESTED CHARACTER INSTRUCTION

Appellant objects to the trial court's refusal to give his requested instruction No. 6

4. The defendant requested that the court give the following instruction regarding good character:
   "Evidence of Mr. Duran's good character may present a fact from which you may infer that he did not commit the crimes charged, considering whether a person of previously unblemised [sic] character would have commited [sic] the crime charged. While evidence of Mr. Duran's prior good character is not a complete defense to the charges against him, it is sufficient, by itself, to raise the reasonable doubt which the law allows as the basis of a verdict of not guilty."

regarding character and reputation evidence and, instead, instructing the jury in accordance with a standard character and reputation instruction. Recommended Arizona Jury Instructions (RAJI) 11 [4]. Appellant contends that the language used in the instruction given takes away from the jury the right to infer from character evidence presented that appellant did not commit the crimes as charged. In support of his position, appellant cites *Singh v. State,* 35 Ariz. 432, 280 P. 672 (1929).

While evidence of good character is substantive and the jury must be given an opportunity to consider any such evidence, *State v. Kaiser,* 109 Ariz. 244, 508 P.2d 74 (1973), such was the case here. *State v. Childs,* 113 Ariz. 318, 553 P.2d 1192 (1976), where the RAJI instruction, *supra,* substantially identical to the one given here, was approved by the Supreme Court, is controlling. Appellant argues that the *Childs* court failed to consider its own opinion in *Singh.* We disagree.

In *Singh, supra,* the giving of the following instruction was found to be error:

"The previous good character of the defendant, if such has been proved, is a proper matter for the consideration of the jury like any other fact proved in the case. If, however, you are satisfied beyond a reasonable doubt from all the facts and circumstances proved in the case, that the defendant is guilty of the crime as charged in the information, then it is your duty to find the defendant guilty, even though you may be satisfied

The court instead gave the following instruction:
   "Defendant has introduced testimony regarding his good reputation for honesty and integrity in the community.
   Consider such testimony together with all the other evidence. If you are convinced beyond a reasonable doubt that defendant is guilty of the crime charged, you must not use evidence of good reputation as an excuse to acquit the defendant."

from the evidence that the defendant sustained a good character and reputation previous to and up to the time of the commission of the crime charged." 35 Ariz. at 441, 442, 280 P. at 675.

In essence, this instruction took the consideration of good character away from the jury if they accepted as true the other evidence relating to the charge. Unlike *Singh*, however, the instruction given here and approved in *Childs* states that evidence of good character must be considered by the jury along with all the other evidence in the case in determining the guilt or innocence of the defendant. This is the correct statement of the law on character evidence. *State v. Childs, supra.*

## REFUSAL TO INSTRUCT JURY ON THEORY OF CASE

Appellant next takes issue with the failure of the trial court to instruct the jury on defendant's theory of the case that the alterations of the PIVs occurred in the course of his employment. The State, on the other hand, argues that the general instruction given to the jury that the acts alleged must have been done willfully and without legal purpose adequately anticipated appellant's requested instruction. The State further argues that there was no evidence presented to the jury to sustain a finding that appellant was authorized to cash checks or to tamper with the deposits, and had such an instruction been given as requested by appellant, this would have constituted a comment on the evidence.

The only evidence presented to the jury that could possibly bear on the issue of whether the alteration of the PIVs was done in the course of appellant's employment was that it was his responsibility to verify the PIVs before taking them over to the Treasurer's office. There was no evidence that any of the alterations were made simply to correct a clerical error or that any of the alterations were made pursuant to the direction of a superior or in accordance with any policy of the agency. A trial court is not required to instruct a jury on matters requested by a defendant unless there is evidence to support such a contention. *State v. Miller*, 108 Ariz. 441, 501 P.2d 383 (1972).

The trial court did, nevertheless, instruct the jury that, in order to find appellant guilty, the jury must find that he altered the public records willfully and without legal purpose. Even if there had been some evidence sufficient to present to the jury, appellant's theory that he had altered the PIVs in the course of his employment with the Registrar of Contractors, appellant's rights were more than protected in this case by the instructions that were actually given by the court. *See State v. Kelley*, 110 Ariz. 196, 516 P.2d 569 (1973). We therefore hold that the trial court did not err in refusing to give appellant's requested instruction.

## INSTRUCTING JURY RELATIVE TO SIGNING TAX RETURN

In instructing the jury regarding the filing of a false Arizona income tax return charge, the trial court quoted from A.R.S. § 43–179 and instructed the jury as follows:

"Section 179(c) of the Arizona Income Tax Act of 1933, as amended (A.R.S. § 43–179(c)) provides that:

'The fact that an individual's name is signed to a return, statement or other document filed shall be a presumption of fact that the return, statement or other document was actually signed by him,' which is to say that, unless and until outweighed by evidence in the case which leads the jury to a different or contrary conclusion, the jury may find that a filed tax return was in fact signed by the person whose name appears to be signed to it."

Appellant raises three objections to the instruction given on this point: (1) that the instruction as given removed an essential element of proof from the State's case; (2) the shifting of the burden of proof to appel-

lant on this point violated the due process requirements of the Federal and State Constitutions; and (3) the instruction as given was a comment on the evidence.

In support of his argument, appellant relies on *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). In *Winship*, the United States Supreme Court held that a New York statute which designated the standard of proof in a juvenile case as a preponderance of the evidence as opposed to the usual criminal standard of beyond a reasonable doubt was a denial of due process to a 12 year old who could be incarcerated for a period of six years for larceny under the reduced standard of proof. The same court in *Mullaney* later held that Maine's rule requiring a defendant charged with murder to prove by a preponderance of the evidence that he acted in the heat of passion or sudden provocation in order to reduce homicide to manslaughter violated the Fourteenth Amendment. The court said the prosecution must prove beyond a reasonable doubt every fact necessary to constitute the prime charge. It might be noted that in *Mullaney* the jury was instructed that the element of malice aforethought was to be conclusively implied unless disproved by the defendant.

■ Both *Winship* and *Mullaney* are distinguishable from the instant case, however, in that here the statutory presumption contained in A.R.S. § 43–179(c) is neither a conclusive presumption of guilt, as in *Mullaney*, nor is it a reduction of the State's obligation of proof beyond a reasonable doubt as in *Winship*. The effect of the instruction given was simply to elevate the fact that appellant's signature appeared on his own income tax return to a presumption which could have been rebutted by appellant had he any evidence with which to rebut it. The presumption which arose was not that appellant had filed the tax return nor that the income tax return was fraudulent or even incorrect and, if fraudulent, not that appellant committed the fraud.

The effect of the statute is simply to raise as a rebuttable presumption that one whose signature appears on a tax return is presumed to have signed the tax return. Thus, appellant was not denied his due process by the statutory presumption. *See also State v. Travis*, 26 Ariz.App. 24, 545 P.2d 986 (1976) (proof of malice as inferred by the use of a gun); *State v. Stone*, 16 Wash.App. 457, 557 P.2d 26 (1976) (possession of burglary tools as *prima facie* evidence of intent to use them); *Fitzgerald v. State*, 339 So.2d 209 (Fla.1976) (intent to deprive inferred from failure to return a rented car at time agreed); *People v. Murphy*, 559 P.2d 708 (Colo.1977) (verbal representation as *prima facie* evidence that one is armed); *State v. Childress*, 78 Ariz. 1, 274 P.2d 333 (1954) (statutory presumption arising from proof of alcohol content of blood).

■ Nor did the quotation from the statute in instructing the jury amount to a comment on the evidence by the trial court. This very point was decided in *State v. Childress, supra*, where the trial court gave the jury instructions on the statutory presumptions arising from proof of alcoholic content of the blood. In holding that reading of a statute relevant to any criminal matter does not constitute a comment on the evidence, the *Childress* court stated as follows:

> "To say that the reading of a pertinent statute in a criminal case constitutes a comment upon the evidence is itself 'a reductio ad absurdum'. The reading of a statute in nowise expresses the view of the judge on any evidence in the case. It is exclusively a statement of law. Therefore we hold that the instructions complained of do not constitute a comment on the evidence." 78 Ariz. at 7, 274 P.2d at 337.

## RESTRICTION OF CROSS–EXAMINATION

■ Appellant's final argument is that his cross-examination of the witness, Garnett J. Taylor, was unconstitutionally cur-

tailed. The witness Taylor had testified through cross-examination that she was familiar with appellant's handwriting. On cross-examination appellant's counsel sought to ask the witness the following question:

"[I]f I were to show you a sample of the handwriting of Mr. Duran and handwriting by the people, copying his style, could you distinguish between them?"

The State's objection to this question was sustained on the grounds that it called for speculation. Appellant now claims that the trial court's sustaining the State's objection unconstitutionally curtailed his right to confront witnesses and particularly his right to cross-examine the witness Taylor.

We hold that the trial court was correct in sustaining the State's objection to the questions propounded by appellant's counsel. At no time did appellant's counsel offer an actual exemplar to the witness to see if she could actually recognize the signature, even though the trial court carefully instructed counsel what to do if he really wanted to test the witness' ability to recognize appellant's handwriting as she claimed she could. The question as it stood was improper as calling for speculation.

Judgments and sentences are affirmed.

FROEB, C. J., and HAIRE, J., concur.